UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KATHLEEN WAGGONER,           )
                             )
            Plaintiff,       )
                             )
      v.                     )        No. 4:04CV1334 CAS
                             )                      (FRB)
JO ANNE B. BARNHART,         )
Commissioner of Social Security, )
                             )
            Defendant.       )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal for review of an adverse determination by the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

**I.  Procedural Background**

On August 22, 2002, plaintiff Kathleen Waggoner protectively filed an application for Supplemental Security Income pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq., in which plaintiff claimed she became disabled on December 1, 2001. (Tr. 56-60.) On initial consideration, the Social Security Administration denied plaintiff's claim for benefits. (Tr. 20, 46-52.) On December 23, 2003, a hearing was held before an Administrative Law Judge (ALJ). Plaintiff testified and was represented by counsel. A vocational expert also testified

at the hearing.  (Tr. 269-94.)  On April 19, 2004, the ALJ issued a decision denying plaintiff's claim for benefits.  (Tr. 8-19.)  On July 31, 2004, the Appeals Council denied plaintiff's request to review the ALJ's decision.  (Tr. 3-6.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Testimony of Plaintiff</u>

At the hearing on December 23, 2003, plaintiff testified in response to questions posed by counsel and the ALJ.  Plaintiff is forty-five years of age.  She stands five feet, seven inches tall and weighs 150 pounds.  Plaintiff completed the eighth grade in school and received cosmetology training.  Plaintiff is divorced and lives with her thirteen-year-old daughter.  (Tr. 272-74.) Plaintiff testified that she receives welfare benefits and food stamps, totaling approximately $480.00 per month.  Plaintiff testified that she and her daughter receive Medicaid benefits. (Tr. 275.)  Plaintiff testified that she had previously been convicted of perjury and served a one-year sentence of imprisonment therefor.  (Tr. 274-75, 277.)

From 1983 to 1985, plaintiff worked in a color booth and as an assembler in a factory.  From 1997 to 1999, plaintiff worked as a stocker and cashier in a retail store.  From March 2000 to February 2001, plaintiff worked as a cook at a restaurant.  (Tr.

114.)  From September to December 2001, plaintiff worked as a cook and cashier at Hardee's Restaurant.  (Tr. 114, 276.)  Plaintiff testified that she left her employment at Hardee's because she was physically and mentally unable to perform the work.  (Tr. 276-77.)

Plaintiff testified that she suffers mentally as a result of personal circumstances she has experienced throughout her life. Specifically, plaintiff testified that she was molested as a child and was subsequently raped from which she conceived a child. Plaintiff testified that the child was given up for adoption after which she ran away from home and became involved in prostitution. (Tr. 278.)  Plaintiff testified that she experiences flashbacks and has disturbed sleep.  (Tr. 284.)  Plaintiff testified that she currently receives psychiatric care and counseling and has been undergoing such treatment for over one year.  (Tr. 278.)

Plaintiff testified that her mental condition causes her to have problems with concentrating and remembering things.  (Tr. 282.)  Plaintiff testified that she gets nervous and panicky around other people.  Plaintiff testified that when she feels stressed, she "freak[s] out" and gets away from everybody.  Plaintiff testified that she stays home as a result of these conditions. Plaintiff testified that she is depressed nearly constantly and takes medication for the condition.  (Tr. 283.)  Plaintiff testified that her appetite fluctuates and that she has difficulty finishing things she sets out to do.  (Tr. 284.)

Plaintiff testified that she also suffers from a back

condition which causes her pain.  Plaintiff testified that she was born with spinal meningitis which has resulted in a curved spine. (Tr. 284.)  Plaintiff testified that she constantly experiences a degree of pain and that lifting heavy items or bending aggravates the pain.  Plaintiff testified that she takes Tylenol and Vioxx for the condition, which give her some relief.  (Tr. 285.)

Plaintiff testified that she also experiences chest pain and heart palpitations which the doctors have informed her is caused by stress and smoking.  (Tr. 286.)  Plaintiff testified that when such an episode comes on, she takes medication and lies down until the episode passes.  Plaintiff testified that she has nitroglycerin tablets but that she has not had the need to use them.  (Tr. 287.)

Plaintiff testified that she drives only when she has to. (Tr. 280.)  Plaintiff testified that her sister visits her at her home about twice a week.  Plaintiff testified that she engages in no other social activities.  Plaintiff testified that she does her own laundry.  (Tr. 281.)

B.  Testimony of Vocational Expert

Gary Weimholt, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.  Mr. Weimholt characterized plaintiff's past work as a cook to be medium and semiskilled and plaintiff's past work as a stocker as medium work.  Mr. Weimholt characterized plaintiff's assembly work as light and unskilled.  (Tr. 289.)  The ALJ then asked Mr. Weimholt

to assume a person of the same age, education and work experience as plaintiff

> who can sit for about six hours over the course of an eight-hour workday, who can stand, walk for about six hours over the course of an eight-hour workday, who needs sit/stand option after sixty minutes of continuous standing or sixty minutes of continuous sitting. Would not need to do the next activity for a full 60 minutes, but at least would need at least a 10-minute opportunity to do the other activity before resuming the original. So if sitting for 60 minutes, would have to stand or be able to get up for at least 10 minutes before resuming sitting. Can lift and carry 20 pounds occasionally, 10 pounds frequently. Can occasionally bend, stoop, and crouch. Can not climb a rope, ladder, or scaffold. And if we would divide work activity in terms of stress to low stress, moderate stress, or high stress restricted to work activity, which is low stress in nature and using the same low, moderate, or high or I should minimal, moderate, or maximum would be my three choices on this one. Minimal interaction with supervisors, coworkers, and the public on a scale with the choice of minimal, moderate, or maximum.

(Tr. 289-90.)

In response, Mr. Weimholt testified that such a person could not perform plaintiff's past work, but that such a person could perform simple electronic assembly jobs, of which approximately 2,500 exist in the State of Missouri; and hand packaging jobs, of which approximately 1,500 exist in the State of Missouri. (Tr. 291.)

The ALJ then asked Mr. Weimholt to assume a person with no exertional limitations, but that she had

> poor or no ability to deal with the public,
> interact with supervisors, maintain attention
> and concentration. Further assume the
> following abilities are fair, which is defined
> as serious limitation, but not precluded.
> Fair ability to maintain a personal
> appearance, behave in an emotional stable
> manner, and demonstrate reliability.

(Tr. 290.)

Mr. Weimholt testified that such a person could not perform plaintiff's past work nor any other work. (Tr. 290.)

Plaintiff's counsel then asked Mr. Weimholt to assume an individual who has

> poor or no ability where that's defined as no
> useful ability to function in this area, to
> deal with the public, use judgment, interact
> with supervisors, deal with work stresses,
> function independently to make all the
> performance adjustments and then poor or no
> ability also to behave in an emotionally
> stable manner and relate predictably in social
> situations[.]

(Tr. 292.)

Mr. Weimholt testified that such a person could not perform plaintiff's past relevant work nor could perform any other jobs existing in the national economy. (Tr. 293.)

### III.  Medical Records

On August 14, 2001, plaintiff visited Dr. J. Crane, a psychiatrist, at the Family Wellness Program and reported that she felt bad all of the time, felt she did not belong, and was not

- 6 -

eating or sleeping.  Plaintiff reported that she has had life-long problems and that she had recently thought about suicide. Plaintiff reported that she feels tense.  Plaintiff reported that her primary physician has prescribed Zoloft,[1] Wellbutrin[2] and Lorazepam,[3] but that the latter did not provide much help. Plaintiff reported that she had been taking medication for two months and that they somewhat helped her mood.  Plaintiff reported that she had crying spells for no reason and avoids people. Plaintiff reported that she was sexually abused by her mother's boyfriend when she was eight years of age and was raped when she was fifteen, which resulted in pregnancy.  Plaintiff reported that she never got along with her mother and ran away a lot.  (Tr. 138.) Plaintiff reported that she recently moved to the area to get away from her family.  It was noted that plaintiff was not presently working.  Mental status examination showed plaintiff to be dysphoric and slowed.  Plaintiff appeared much older than her stated age.  Dr. Crane diagnosed plaintiff with Major Depression Disorder, Dysthymia/ Chronic Anxiety, and Post-Traumatic Stress Disorder (PTSD).  Plaintiff was instructed to increase her dosages

---

[1]Zoloft is indicated for the treatment of depression. Physicians' Desk Reference 2553-54 (55th ed. 2001).

[2]Wellbutrin is indicated for the treatment of depression. Physicians' Desk Reference 1485-86 (55th ed. 2001).

[3]Lorazepam is indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety or anxiety associated with depressive symptoms.  Physicians' Desk Reference 3348 (55th ed. 2001).

of Zoloft and Wellbutrin and to undergo counseling as soon as possible. (Tr. 137.)

On August 20, 2001, plaintiff met with Counselor Mary Lato, MSW/LCSW, at the Family Wellness Program and reported that her father was an alcoholic who abused her mother, which she witnessed; that she was abused at an early age by her mother's paramour; that she was raped at the age of fifteen by a sister's boyfriend; that she never completed high school; and that she had been depressed for a long time. Counselor Lato diagnosed plaintiff with PTSD and Dysthymic Disorder and determined to see plaintiff at the next available appointment. (Tr. 136.)

On March 9, 2002, plaintiff visited Dr. David Pittenger and complained of symptoms associated with sinusitis. (Tr. 129.)

On June 4, 2002, plaintiff visited Dr. Pittenger and complained of symptoms associated with bronchitis. (Tr. 128.)

On August 14, 2002, plaintiff visited Dr. Pittenger and complained of low back pain which radiated down her right leg to her right heel. Dr. Pittenger noted plaintiff's panic to be better. Plaintiff was diagnosed with right sciatica and panic/ anxiety with depression. Plaintiff was prescribed Vioxx.[4] (Tr. 126.)

On August 21, 2002, plaintiff visited Counselor Lato and

---

[4]Vioxx is indicated for the relief of signs and symptoms of osteoarthritis and for the management of acute pain. Physicians' Desk Reference 2049-50 (55th ed. 2001).

reported that she was working on a relationship with her mother. Ms. Lato noted that plaintiff had not progressed since the previous year and observed that plaintiff was now willing to feel better. (Tr. 135.) On a scale of one to ten, plaintiff rated herself at a level four as to how well she felt she was doing the things she needed to do in her day-to-day life. Level four was indicated to be in the "average" range. (Tr. 245.) Ms. Lato noted plaintiff's diagnoses not to have changed. Ms. Lato advised plaintiff to keep her appointments and to use positive thinking. (Tr. 135.)

Plaintiff visited Counselor Lato on September 9, 2002, and reported that no one wanted to listen to her and that she felt badly. (Tr. 134.) As to how well she felt she was doing the things she needed to do in her day-to-day life, plaintiff rated herself at a level five, within the average range. (Tr. 244.) Ms. Lato indicated that a letter was prepared and sent to DFS stating that plaintiff was unable to work at the time due to her mental health. There was no change in plaintiff's diagnoses, but Ms. Lato noted that plaintiff seemed to feel better. Plaintiff was to be seen at the next available appointment. (Tr. 134.)

On September 13, 2002, plaintiff complained to Dr. Pittenger of having experienced pain in her left side and of heart palpitations for two to three days. Dr. Pittenger questioned whether plaintiff had a mood disorder and diagnosed plaintiff with premature ventricular contraction (PVC) and reactive depression. Plaintiff was instructed to discontinue her caffeine intake and to

discontinue her tobacco use.  Plaintiff was prescribed Wellbutrin.
(Tr. 187.)

On October 2, 2002, plaintiff underwent a consultative
examination by Dr. Sarwath Bhattacharya for Disability
Determinations.  (Tr. 139-46.)  Plaintiff complained of low back
pain and reported that she was born with spinal meningitis and has
had low back pain as result which has worsened during the last
eight to ten years.  Plaintiff reported that the pain radiates to
the right leg and toes.  Plaintiff reported that she takes Tylenol
for pain.  Plaintiff reported that she can walk five blocks, stand
for two to three hours, sit for three to four hours, and lift about
fifteen to twenty pounds, but that she has difficulty bending down.
Plaintiff reported that she also has pain in her right hand as a
result of a break which occurred when she was twelve years of age
which caused some nerve damage in the right thumb.  Plaintiff also
reported that she has suffered from depression for a very long
time.  (Tr. 139.)  Plaintiff denied any suicidal or homicidal
thoughts or tendencies and reported that she does not have any
crying spells.  Plaintiff reported that she is forgetful.  (Tr.
139-40.)  It was noted that plaintiff had no other psychiatric
problems.  Plaintiff reported that she feels her heart racing and
has occasional chest pain, but that such condition has not been
medically evaluated.  Dr. Bhattacharya noted plaintiff's current

medications to include Wellbutrin, Zoloft, Risperdal,[5] Allegra, and Tylenol. It was noted that plaintiff performs all of the housework at home and that her daughter provides a little help. Plaintiff appeared in no acute distress. (Tr. 140.) Physical examination showed plaintiff to have mild kyphoscoliosis in the lower thoracic region of the back as well as in the lumbar spine. Straight leg raising was painful and slightly limited. Plaintiff's gait was within normal limits and plaintiff was able to walk on her heels and toes. Plaintiff had no difficulty getting on and off the examination table. Examination of the hands showed dextrous movements of the fingers and good hand grips with no loss of range of motion. Musculoskeletal examination showed no muscle atrophy or tenderness in the back or anywhere else. (Tr. 141.) Plaintiff had limited range of motion of both knees and of the lumbar spine. (Tr. 143-44.) X-rays of the lumbar spine showed mild degenerative and hypertrophic changes. (Tr. 146.) Neurological examination was unremarkable. (Tr. 141.) Dr. Bhattacharya diagnosed plaintiff with low back pain with radicular symptoms, mild kyphoscoliosis of the lumbosacral area with no clinical radicular changes; depression and anxiety, stable with minimal symptoms; tobacco addiction; and xanthelasma, indicating high cholesterol. (Tr. 141-42.)

Plaintiff returned to Counselor Lato on October 9, 2002,

--------

[5]Risperdal is indicated for the management of the manifestations of psychotic disorders. Physicians' Desk Reference 1453-54 (54th ed. 2000).

and shared her recollection of childhood events involving fighting between her father and mother. Ms. Lato noted plaintiff to be starting to tell more of her feelings. (Tr. 209.) As to how well she felt she was doing the things she needed to do in her day-to-day life, plaintiff rated herself at a level six, which was in the average range. (Tr. 242.)

On October 10, 2002, plaintiff continued to complain of chest pain to Dr. Pittenger. Dr. Pittenger diagnosed plaintiff with chest pain with PVC's and determined to have plaintiff undergo a thallium stress test. Vioxx was prescribed. (Tr. 186.)

Plaintiff returned to Counselor Lato on October 15, 2002, and told of places she felt safe when she was a child. Plaintiff reported to Ms. Lato that she was worried about a heart problem that she may be currently experiencing. Ms. Lato continued in her diagnoses of plaintiff. Ms. Lato observed plaintiff to feel somewhat better but noted that she "ha[d] a long way to go." (Tr. 208.)

On November 11, 2002, plaintiff returned to Counselor Lato and reported having been involved in a car accident which totaled her car. Ms. Lato noted that plaintiff was lucky to be alive but depressed in that she now had no way to get around and must ask neighbors for a ride. (Tr. 207.) As to how well she felt doing the things she needed to do in her day-to-day life, plaintiff rated herself at a level six, which was in the average range. (Tr. 239.) Ms. Lato continued in her diagnoses of plaintiff and

observed plaintiff to be making slight progress, noting that she "could be doing worse." (Tr. 207.)

Plaintiff underwent a stress test on November 15, 2002, at St. John's Mercy Hospital in response to her complaints of chest pain, the results of which were positive with mild chest pressure and frequent ventricular ectopy during the recovery phase. (Tr. 163.)

On December 3, 2002, plaintiff reported to Counselor Lato that she felt scared and anxious regarding her upcoming cardiologic appointment. Plaintiff was advised that such feelings were normal. (Tr. 206.)

Plaintiff returned to Dr. Crane on December 17, 2002, who noted plaintiff to be seeing Counselor Lato for counseling. Dr. Crane noted plaintiff to be taking Wellbutrin and Zoloft and that she was trying to quit smoking but reported that she was unable to because she was nervous. Plaintiff reported to Dr. Crane that she was scheduled for follow up cardiac tests because she may have a blocked artery. Mental status examination showed plaintiff to be dysphoric. Dr. Crane instructed plaintiff to continue with her medications and to add Ativan[6] until after her heart condition was diagnosed. (Tr. 193.) On that same date, Dr. Crane wrote the following memo: "This lady will be disabled for any work

_____

[6]Ativan is indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety or anxiety associated with depressive symptoms. Physicians' Desk Reference 3348 (55th ed. 2001).

indefinitely [due to] coronary artery disease and major depressive disorder." (Tr. 215.)

On December 18, 2002, plaintiff visited Dr. Pittenger to have some forms completed. Dr. Pittenger diagnosed plaintiff with coronary artery disease (CAD) and Major Depressive Disorder. Wellbutrin, Zoloft, Ativan, and Risperdal were prescribed. (Tr. 185.)

On December 23, 2002, plaintiff underwent evaluation at the Cardiology Clinic at Washington University for chest pains. (Tr. 148-52.) Plaintiff reported that the chest pain is a squeezing sensation and that she experiences the pain on almost a daily basis. Plaintiff reported increased dyspnea and palpations over the past year. Plaintiff reported no prolonged episodes of heart racing. It was noted that a June 2002 exercise echocardiogram and electrocardiogram showed no evidence of ischemia. It was also noted that a November 2002 exercise thallium test and electrocardiogram showed non-specific ST-T wave changes and frequent ventricular ectopy during the recovery phase. (Tr. 148.) It was noted that plaintiff smoked two packs of cigarettes a day. During a stress test, it was noted that plaintiff showed no definite evidence of ischemia but that she experienced chest pressure. Dr. Suma Thomas recommended a cardiac catheterization which was then scheduled for January 2003. Plaintiff was instructed to take an aspirin daily and was given a prescription for nitroglycerin. (Tr. 149.)

A cardiac catheterization performed on January 2, 2003, showed no significant disease. (Tr. 150.) It was recommended that plaintiff make every effort to quit smoking. (Tr. 151.)

Plaintiff returned to Counselor Lato on January 7, 2003, and reported the favorable outcome of her recent heart tests. Plaintiff reported that she told her doctor of her anxiety and depression and that her doctor did not prescribe any medication for her heart beat. Ms. Lato continued in her same diagnoses of plaintiff and noted that plaintiff appeared to be more reflective. (Tr. 205.)

Plaintiff visited Dr. Pittenger on January 9, 2003, complaining of ear and throat pressure with headaches. Plaintiff was diagnosed with bronchitis and viral upper respiratory infection and medication was prescribed. (Tr. 184.)

On January 21, 2003, Dr. Crane noted plaintiff's cardiac tests to be normal and instructed plaintiff to continue on her psychotropic medications, including Risperdal which was prescribed by her family physician for nerves. (Tr. 193.) Mental status examination showed plaintiff to seem okay. (Tr. 192.) Plaintiff reported that her current medications kept her mood stable, but that she continued to have chest pain. (Tr. 192-93.)

Plaintiff returned to Dr. Pittenger on January 30, 2003, and continued in her respiratory complaints. It was noted that plaintiff took one Lorazepam for anxiety. It was also noted that plaintiff took Wellbutrin and Zoloft and that plaintiff's

depression was stable on medication.  Plaintiff was instructed to stop smoking and medication was prescribed for bronchitis.  (Tr. 183.)

On February 3, 2003, plaintiff reported to Counselor Lato of her feelings and of her hope for the future.  Plaintiff reported that her daughter was doing well in school and that plaintiff was proud of her.  Ms. Lato continued in the same diagnoses and noted plaintiff to be doing better but to be "under the weather."  (Tr. 204.)

On March 5, 2003, plaintiff shared more about herself with Counselor Lato and reported of her father's abuse of her younger sister.  Plaintiff continued to report of her pride in her daughter's successes.  Ms. Lato noted plaintiff to be able to say that she was a survivor of sexual abuse and that plaintiff felt good and stronger with this statement.  (Tr. 203.)  On April 10, 2003, plaintiff continued with her survival statements to Ms. Lato. (Tr. 202.)

Plaintiff returned to Dr. Crane on April 8, 2003, and reported that she was "okay" and that she was up and down but "hanging in there."  Dr. Crane noted plaintiff to worry a lot and especially about the health of her sister and mother.  Dr. Crane noted plaintiff to ruminate a lot about the bad things that have happened to her and that she sometimes talks to herself about them. Dr. Crane encouraged plaintiff to talk with someone she trusts, such as Mary Lato, about her fears.  Mental status examination

showed plaintiff to seem stable. Plaintiff was instructed to continue with her medications. (Tr. 192.)

Plaintiff visited Dr. Pittenger on April 16, 2003, with complaints associated with bronchitis and sinusitis. (Tr. 182.)

Plaintiff appeared at the emergency room at St. John's Mercy Hospital on May 12, 2003, with complaints relating to appendicitis. (Tr. 155-62.) Plaintiff reported her current medications to be Singulair and Albuterol inhaler. (Tr. 159.) Review of psychiatric systems showed no depression or anxiety. (Tr. 157.) Dr. James Jansen admitted plaintiff and a laparoscopic appendectomy was performed. (Tr. 161-62.) Plaintiff was discharged on May 13, 2003. (Tr. 154, 169.)

On May 20, 2003, plaintiff visited Dr. Jansen for follow up of her appendectomy. Dr. Jansen noted plaintiff to be doing well and reported that plaintiff could resume activities, including going back to work. Plaintiff complained of a subcutaneous nodule at the left lower rib cage and reported that she has had some pain in the area. Dr. Jansen recommended that plaintiff take Tylenol or ibuprofen and to advise if the condition worsens. (Tr. 168.)

Plaintiff visited Dr. Pittenger on May 28, 2003, and complained of dizziness, sore throat and ear pain. Plaintiff was diagnosed with vertigo and eustachian blockage. (Tr. 181.)

Plaintiff returned to Dr. Crane on July 1, 2003, who noted no change in plaintiff's mental status, except that she was concerned regarding the tumor. Dr. Crane advised plaintiff to get

a second medical opinion regarding the condition. Plaintiff was
instructed to continue on her current medications. (Tr. 191.)

On July 25, 2003, plaintiff visited Dr. Pittenger and
complained of pain in her left side. Plaintiff reported that she
had a "knot" upon palpation which was confirmed with an MRI taken
in relation to her appendicitis. Plaintiff also reported having
dizzy spells for two weeks. A soft nodule was noted along the
lower left rib cage. Dr. Pittenger determined to obtain the MRI
and questioned whether plaintiff had lipoma of the left rib cage.
(Tr. 180.)

From May through September 2003, plaintiff visited
Counselor Lato on a monthly basis and continued to affirm her being
a survivor of sexual abuse. Ms. Lato noted that plaintiff had
appeared to make amends with her mother. Plaintiff complained of
physical problems, including the tumor on her side and an enlarged
artery. (Tr. 197-201.) In August, Ms. Lato noted plaintiff to be
having no major problems at home and to be doing good with her
medications. (Tr. 198.)

On September 24, 2003, Counselor Lato assessed
plaintiff's condition for insurance purposes and noted plaintiff to
experience confusion, inattention or memory loss; significant
weight changes, appetite changes and sleep disturbance; and
multiple psychotropic medications, medical complications and
chronic illness, and panic symptoms. Ms. Lato opined that
plaintiff's impairment caused a moderate degree of risk in

plaintiff's ability to cope with unexpected changes and to form/keep a positive relationship; and a severe degree of risk in plaintiff's ability to function at work. Ms. Lato assessed plaintiff's current Global Assessment of Functioning (GAF) score to be 70. (Tr. 220.)

On October 7, 2003, plaintiff visited Dr. Crane for follow up and reported that she could not get a second opinion regarding her medical condition and that she was now having pain in her left side and was worried. Dr. Crane urged plaintiff to "raise hell" and stand up for herself and to contact her primary physician. Mental status examination showed no major change. Plaintiff was to continue on her medications. (Tr. 191.)

Plaintiff visited Dr. Pittenger on October 13, 2003, and complained of pain in her shins and ankles and reported swelling in her hands and feet with tingling in her ankles. Dr. Pittenger noted plaintiff to have moderate lumbar pain. Plaintiff also inquired as to the tumor on her left side. Dr. Pittenger noted the lump in the left flank to be about one square inch in size and questioned whether it was lipoma. Plaintiff was diagnosed with left flank mass and lower extremity neuropathy and plaintiff was referred to Dr. Jansen. (Tr. 179.)

Plaintiff visited Dr. Jansen on October 16, 2003, regarding the rib cage nodule. Dr. Jansen felt no real palpable mass in the area. Dr. Jansen diagnosed probable costochondritis and recommended nonsteroidal medications to plaintiff. (Tr. 167.)

On October 22, 2003, Counselor Lato noted plaintiff not to be doing well with her abuse and becoming a survivor. (Tr. 196.)

Plaintiff visited Dr. Pittenger on November 10, 2003, in relation to complaints of sinusitis for which medication was prescribed. Zoloft was also prescribed for plaintiff. (Tr. 178.)

On November 12, 2003, Dr. Pittenger completed a Physician's Assessment for Disability Determinations in which he reported plaintiff's diagnoses to be Anxiety/Depression, Sinusitis, and Appendectomy. Dr. Pittenger noted that plaintiff's heart check was normal on perfusion scan. When questioned whether plaintiff's impairment would effect her ability to understand, remember and carry out simple instructions; respond appropriately to supervision, co-workers and usual work situations; deal with changes in a routine work setting; and maintain attention and concentration and deal with work stresses, Dr. Pittenger stated only that plaintiff "should be able to work." Dr. Pittenger gave no opinion as to whether plaintiff's endurance was affected by any impairment. (Tr. 177.)

Dr. Crane completed a Mental Medical Assessment on November 18, 2003, for Disability Determinations. (Tr. 189-90.) Dr. Crane reported that plaintiff suffered from Major Affective Disorder which was diagnosed when plaintiff was first seen in August 2001, and that plaintiff had a long history of depression and anxiety, dysfunctional family, and history of childhood sexual

abuse.  Dr. Crane reported plaintiff's current symptoms to include chronic depression, anxiety and very low self esteem.  Recommended treatment included supportive psychotherapy and medications.  Dr. Crane opined that plaintiff's condition resulted in a moderate to severe impairment in all areas of her ability to sustain full-time employment and that plaintiff's condition prevented such employment.  (Tr. 189.)  Specifically, Dr. Crane opined that plaintiff had a fair ability to follow work rules, relate to co-workers, function independently, maintain personal appearance, and demonstrate reliability; but poor or no ability to deal with the public, use judgment, interact with supervisors, deal with work stresses, be attentive/concentrate, behave in an emotionally stable manner, and relate predictably in social situations.  Dr. Crane further opined that plaintiff had poor or no ability to understand, remember and carry out job instructions which were either complex, detailed but not complex, or simple.  (Tr. 190.)

On December 17, 2003, plaintiff complained to Counselor Lato of pain in her left side and that she was not sleeping well. Ms. Lato continued in the same diagnoses of plaintiff.  (Tr. 221.) On that same date, Ms. Lato completed a Mental Medical Assessment for Disability Determinations.  (Tr. 218-19.)  Ms. Lato reported that plaintiff experiences flashbacks with PTSD from her childhood abuse and that she needs continued care.  Ms. Lato opined that plaintiff was unable to currently work due to her health problems and how she feels about herself.  (Tr. 218.)  Ms. Lato specifically

opined that plaintiff had a fair ability to relate to co-workers, use judgment, function independently, maintain personal appearance, behave in an emotionally stable manner, and demonstrate reliability. Ms. Lato opined that plaintiff had poor or no ability to deal with the public, interact with supervisors, deal with work stresses, be attentive/concentrate, and relate predictably in social situations. Ms. Lato further opined that plaintiff had poor or no ability to understand, remember and carry out detailed but not complex job instructions, and a fair ability to understand, remember and carry out job instructions which were either complex or simple. (Tr. 219.)

On January 28, 2004, plaintiff underwent a consultative psychological evaluation for Disability Determinations. (Tr. 252-59.) Dr. Paul W. Rexroat noted plaintiff to complain that she could not work fast and remember things on the job; that she has pain in her chest, back and leg when she lifts or carries things; that she has wrist problems; and that she suffers from depression. (Tr. 252.) Plaintiff reported her abusive childhood history and that she left school after the eighth grade. Plaintiff reported that she is weak in reading and math and that her daughter is trying to teach her math skills. (Tr. 252-53.) Plaintiff reported having left home during her childhood and having become a prostitute for three or four years. Plaintiff reported that she served two years in prison having been convicted of perjury when she was seventeen years of age. Plaintiff reported having suffered

depression since a child and that she has bad dreams. Plaintiff reported that, as an adult, she was in a physically abusive relationship which resulted in a miscarriage. Dr. Rexroat noted plaintiff's medications to include Wellbutrin, Risperdal, Lorazepam, and Zoloft, and plaintiff reported that such medications made her feel a lot better in that they took the edge off. Plaintiff reported that she cannot "deal with stuff" without her medication. Mental status examination showed plaintiff to be slightly anxious and tense. Plaintiff had a mildly restricted range of emotional responsiveness and a flat and sad affect. Plaintiff had a normal energy level and was alert and cooperative. (Tr. 253.) Plaintiff reported having occasional mood swings and panic attacks. Plaintiff reported being not happy and depressed approximately twenty to twenty-five days each month. Dr. Rexroat noted plaintiff to be moderately depressed. Plaintiff reported that she does not like to be around others and that she sometimes does not have the energy to get out of bed. Plaintiff reported having crying spells a couple of times each week. Plaintiff reported that she has bad dreams and that she dreams and thinks about killing her abusers but that she has never tried to kill anyone. Plaintiff reported having frequent suicidal ideation but has never made any attempts. Plaintiff reported having occasional trouble getting to sleep and that her dreams make it difficult for her to sleep. (Tr. 254.) Cognitive functioning showed plaintiff's recent and remote memory to be fair. Plaintiff was well oriented

to time, place, person, and situation. Plaintiff's verbal judgment and reasoning were unremarkable. Plaintiff had difficulty performing math problems. (Tr. 254-55.) Dr. Rexroat estimated plaintiff's IQ to be between 65 and 75. (Tr. 255.) Dr. Rexroat administered the Minnesota Multiphasic Personality Inventory-II (MMPI-II) during which Dr. Rexroat observed plaintiff's test-taking behavior as follows:

> All test items were completed. The absence of any omissions suggests cooperation and understanding of the test questions. The standard validity indicators suggest average denial of common, ordinary faults and imperfections, minimal overall defensiveness, and an extremely high level of uncommon responses. This patterns suggests an extreme tendency to overstate problems. A tendency to overemphasize problems suggests the possibility of motivational distortion to portray emotional disturbance. However, other possible factors include acute distress, a high degree of self-criticism, and a desire for attention, sympathy, and assistance.

(Tr. 255.)

From the results of the MMPI-II examination, Dr. Rexroat made the following profile analysis:

> This individual may have difficulty in functioning due to extreme, perhaps over-whelming, depression, anxiety, and feelings of inadequacy. The resulting impairment in behavior may range from diminished activity and decreased motor speed to withdrawal, passivity, and indifference. She may also have difficulty in concentrating, recognizing alternatives, and reaching decisions based

upon a clear understanding of the information
pertaining to them. Difficulty in communi-
cating effectively and assertively may contri-
bute to discouragement, social alienation, and
difficulty in forming close, satisfying rela-
tionships. She may waver between resentment
toward others and feelings of worthlessness.
A sense of futility may arise at times, and
there may be a risk of self-destructive
behavior.

She expresses significant symptoms and
concerns in the area of physical health
problems. She reports a variety of somatic
symptoms and may feel that they are outside of
her control. However, she may have difficulty
in focusing upon specific identifiable
conditions or in communicating effectively
with health professionals. She may feel that
they do not listen, understand, and provide
the proper information, treatment, and sym-
pathy. She may from [sic] stress related
somatic symptoms. Some physical complaints
may express anxiety and emotional discomfort
rather than an actual physical condition.
This may occur, for example, in response to
stressful situations or in an effort to gain
attention and some form of assistance that is
otherwise not available. Frequently feeling
frustrated, tense, and dissatisfied with the
efforts of others, she may become complaining,
irritable, critical, and demanding. This may
contribute to conflict with others and
decrease the very support and understanding
that she needs. Excessive attention to mala-
dies may also limit her range of activities
and release her from certain responsibilities.

(Tr. 255.)


Dr. Rexroat diagnosed plaintiff with major depression, recurrent,

moderate; PTSD; and panic disorder without agoraphobia. With

respect to whether plaintiff's impairment resulted in any

functional limitations, Dr. Rexroat opined that plaintiff had

marked limitations in her activities of daily living, and marked to severe limitations in her ability to interact socially and in her ability to adapt to her environment. Dr. Rexroat further opined that plaintiff was able to sustain concentration, persistence and pace with simple tasks. (Tr. 257.) Dr. Rexroat assigned a GAF score of 50. Plaintiff's motivation was noted to be good and her prognosis guarded. (Tr. 258.)

In a Mental Medical Source Statement dated February 2, 2004, Dr. Rexroat opined that plaintiff's mental impairment slightly affected plaintiff's ability to understand, remember and carry out short, simple instructions. Dr. Rexroat opined that plaintiff's impairment resulted in marked limitations in plaintiff's ability to understand, remember and carry out detailed instructions and in her ability to make judgments on simple work-related decisions. (Tr. 260.) Dr. Rexroat further opined that plaintiff's condition caused her to suffer moderate limitations in her ability to interact appropriately with co-workers and marked limitations in her ability to interact appropriately with the public and with supervisors, and respond appropriately to work pressures in a usual work setting and to changes in a routine work setting. (Tr. 261.)

## IV.  The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since December 1, 2001, the alleged

onset date of disability. The ALJ determined plaintiff's impairments of moderate depression, post-traumatic stress disorder, panic disorder without agoraphobia, and back strain not to meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4, either individually or in combination. The ALJ found plaintiff's allegations of disabling symptoms precluding all substantial gainful activity not to be credible. The ALJ found that plaintiff had the residual functional capacity to perform work except for work involving frequently lifting over ten pounds; occasionally lifting over twenty pounds; or climbing ropes, ladders or scaffolds. The ALJ also found that plaintiff could only occasionally bend, stoop or crouch. The ALJ determined that plaintiff should engage in work that is low stress in nature and with only minimal interaction with supervisors, co-workers and the public. The ALJ determined that plaintiff could sit for six hours and stand and walk for six hours in an eight-hour workday, but that she could continuously sit and/or stand for only sixty minutes before requiring a ten-minute break. The ALJ determined plaintiff to need a sit/stand option. The ALJ determined plaintiff not able to perform her past relevant work. Considering plaintiff's residual functional capacity, age, education, and work experience, the ALJ determined that plaintiff could perform a significant number of jobs which exist in the national economy, including assembler and hand packager. The ALJ thus determined plaintiff not to be under a disability.

## V. Discussion

To be eligible for Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The claimant bears the initial burden of proof to show that she is unable to perform her past relevant work. Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995). If this burden is met, the burden of proof then shifts to the Commissioner to demonstrate that the claimant has the residual functional capacity to perform other work in the national economy. Id.

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20

C.F.R. § 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987).
The Commissioner begins by deciding whether the claimant is engaged
in substantial gainful activity.  If the claimant is working,
disability benefits are denied.  Next, the Commissioner decides
whether the claimant has a "severe impairment," meaning one which
significantly limits her ability to do basic work activities.  If
the claimant's impairment is not severe, then she is not disabled.
The Commissioner then determines whether claimant's impairment
meets or is equal to one of the impairments listed in 20 C.F.R.,
Subpart P, Appendix 1.  If claimant's impairment is equivalent to
one of the listed impairments, she is conclusively disabled.  At
the fourth step, the Commissioner establishes whether the claimant
can perform her past relevant work.  If so, the claimant is not
disabled.  Finally, the Commissioner evaluates various factors to
determine whether the claimant is capable of performing any other
work in the economy.  If not, the claimant is declared disabled and
becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this
Court if they are supported by substantial evidence.  42 U.S.C. §
405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v.
Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence
is less than a preponderance but enough that a reasonable person
would find it adequate to support the conclusion.  <u>Johnson v.
Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is

supported by substantial evidence, the Court must review the entire

administrative record and consider:

    1.  The credibility findings made by the ALJ.

    2.  The plaintiff's vocational factors.

    3.  The medical evidence from treating and
        consulting physicians.

    4.  The plaintiff's subjective complaints
        relating to exertional and non-exertional
        activities and impairments.

    5.  Any corroboration by third parties of the
        plaintiff's impairments.

    6.  The testimony of vocational experts when
        required which is based upon a proper
        hypothetical question which sets forth
        the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86
(8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85
(8th Cir. 1989)).


The Court must also consider any evidence which fairly detracts

from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d

1047, 1050 (8th Cir. 1999).  However, even though two inconsistent

conclusions may be drawn from the evidence, the Commissioner's

findings may still be supported by substantial evidence. Pearsall,

274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th

Cir. 2000)).  A Commissioner's decision may not be reversed merely

because substantial evidence also exists that would support a

contrary outcome.  Jones ex rel. Morris v. Barnhart, 315 F.3d 974,

977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole for the reason that in determining plaintiff's residual functional capacity (RFC), the ALJ failed to give proper weight to the opinions of plaintiff's treating mental sources and the administration's consulting mental source, and erred in his adverse determination of plaintiff's credibility. For the following reasons, plaintiff's arguments are well taken.

Residual functional capacity is what a claimant can do despite her limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. § 416.945(a)). Inasmuch as the claimant's subjective complaints play a role in the ALJ's RFC assessment, the ALJ must first determine the claimant's credibility. Ellis v. Barnhart, 392 F.3d 988, 995-96 (8th Cir. 2005).

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any

precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, he may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Id. Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005); Pearsall, 274 F.3d at 1218.

In the instant cause, the ALJ addressed several alleged inconsistencies in the record to support his conclusion that plaintiff's complaints of disabling pain were not credible. Specifically, the ALJ noted plaintiff to have a poor earnings record inasmuch as many of plaintiff's years of employment show earnings of less than $5,000.00. The ALJ also noted that plaintiff's daily activities of performing all household chores, visiting with her sister, driving, and caring independently for her thirteen-year-old daughter were inconsistent with her claims that she was physically and mentally unable to perform the activities of light work. The ALJ also noted plaintiff's depression appeared to be stable with medication and that no medical evidence supported a

claim of a severe heart condition. The ALJ further noted that plaintiff's failure to seek regular and sustained treatment for her alleged back strain and leg and ankle problems detract from her complaints that such conditions are disabling. Finally, the ALJ noted plaintiff's previous conviction for felony perjury to detract from her credibility. These findings are supported by substantial evidence in the record as a whole.

However, the ALJ also determined plaintiff not to be credible based, in part, on his finding that despite testifying that she occasionally drove and reported to Dr. Bhattacharya that she performed all household chores with a little help from her daughter, plaintiff "told Dr. Rexroat that she did not drive" and "that she had severe problems with performing household chores and only did a few chores." (Tr. 14.) Contrary to this finding, however, a review of Dr. Rexroat's report fails to show that plaintiff made such statements. While the plaintiff stated to Dr. Rexroat that "she doesn't like to drive because it makes her nervous" (Tr. 257), there is no statement in Dr. Rexroat's report that plaintiff claimed she did not drive. Further, plaintiff reported to Dr. Rexroat that she cleans, does the cooking and the laundry, but that her daughter runs the vacuum cleaner or washes dishes. (Tr. 257.) Rather than being conflicting, this statement appears to be consistent with plaintiff's earlier statement to Dr. Bhattacharya that she performs the household chores with a little help from her daughter. There simply is no statement in Dr.

Rexroat's report that plaintiff claimed she had severe problems performing household chores.  (Tr. 252-58.)

In addition, the ALJ determined to discredit plaintiff's complaints inasmuch as Dr. Rexroat noted the results of the MMPI-II test to suggest that plaintiff had an extreme tendency to overstate problems, that there existed the possibility of motivational distortion to portray emotional disturbance, and that plaintiff's somatic symptoms might be related to plaintiff's motivation for secondary gain.  (Tr. 14, 15.)  A medical opinion of a claimant's exaggeration of symptoms may constitute a basis to find the claimant not credible.  See <u>Ramirez v. Barnhart</u>, 292 F.3d 576, 582 (8th Cir. 2002).  A review of Dr. Rexroat's report in its entirety, however, shows him not to have rendered such an opinion of exaggeration.  While plaintiff's test-taking behavior during the MMPI-II was observed to be consistent with a tendency to overstate problems, Dr. Rexroat opined in his report that other factors are likewise known to cause such results, including acute distress, a high degree of self-criticism, and a desire for attention, sympathy and assistance.  (Tr. 255.)  Similarly, while Dr. Rexroat noted that plaintiff's somatic symptoms may be related to secondary gains, he also noted other factors to cause the phenomena, such as stress, conflict, emotional experiences, and personality traits.  (Tr. 256.)  Indeed, Dr. Rexroat's narrative summary of the MMPI-II results appears to be consistent with a finding that plaintiff possesses the characteristics of such other contributing factors.

Accordingly, to the extent the ALJ attempts to use Dr. Rexroat's report of plaintiff's MMPI-II results to discredit plaintiff's complaints, his determination appears to be based on an incomplete reading of the report.

Finally, the ALJ found that plaintiff failed to seek regular psychiatric treatment and that such failure detracted from her credibility. (Tr. 14, 15.) A review of the record shows the contrary. From August 2001 through December 2003, plaintiff sought and received psychiatric treatment on no less than twenty-four occasions. Such treatment included psychological counseling by a Licensed Clinical Social Worker, as recommended by plaintiff's treating psychiatrist, with such counseling sessions having occurred on a monthly basis since August 2002; regular examinations and treatment by a psychiatrist, with such examinations having occurred every three months since December 2002; and continued prescriptions for psychotropic medications, including Wellbutrin, Zoloft and Risperdal, with such medications being prescribed and monitored by both plaintiff's treating psychiatrist and primary care physician.

Where, as here, several alleged inconsistencies relied on by the ALJ to discredit a claimant's subjective complaints are not supported by the record, such discrepancies undermine the ALJ's ultimate conclusion that the claimant's symptoms are less severe than she claims. Baumgarten v. Chater, 75 F.3d 366, 368-69 (8th Cir. 1996). Further, the failure of the ALJ to properly assess

plaintiff's subjective complaints relating to her mental impairment renders the ALJ's overall credibility determination suspect inasmuch as he failed to examine the possibility that a psychological impairment may aggravate plaintiff's perception of pain. See Pratt v. Sullivan, 956 F.2d 830, 836 (8th Cir. 1992); see also Delrosa v. Sullivan, 922 F.2d 480, 485-86 (8th Cir. 1991) (on remand, ALJ advised to consider aggravating factor posed by possibility that claimant's perception of pain is exacerbated by psychological impairment). As such, it cannot be said that the ALJ's adverse credibility determination is supported by substantial evidence on the record as a whole.

The ALJ's flawed credibility determination likewise undermines the ALJ's ultimate RFC assessment. In assessing plaintiff's RFC, the ALJ determined to give little weight to the opinions of plaintiff's treating psychiatrist, Dr. Crane; treating mental health counselor, Ms. Lato; and consulting psychiatrist, Dr. Rexroat, for the reason that such opinions were based on plaintiff's subjective complaints, determined by the ALJ not to be credible. (Tr. 13, 14, 15.) Because the ALJ's credibility determination of plaintiff's complaints was flawed, his determination to discredit the opinions of these sources to the extent they were based on such complaints was likewise flawed. See, e.g., Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (ALJ's failure to properly credit plaintiff's subjective complaints contributed to ALJ's error in failing to properly credit treating

physician's opinion which was based on plaintiff's complaints).

In addition, the undersigned notes that while discounting the opinions of Drs. Crane and Rexroat and Counselor Lato, the ALJ explicitly determined to accord greater weight to the opinions of Drs. Bhattacharya, Jansen, Thomas, and Pittenger regarding plaintiff's ability to perform work-related activities. Such determination was error. Dr. Bhattacharya was a one-time examining physician who performed a consultative physical examination of plaintiff for Disability Determinations in September 2002. Dr. Jansen was the physician at St. John's Mercy Medical Center who admitted plaintiff in May 2003 regarding plaintiff's appendicitis and saw plaintiff for follow up examination on one occasion regarding the surgery and on one other occasion regarding the rib cage nodule. Dr. Thomas was the cardiologist who performed the cardiologic consult in December 2002. And finally, Dr. Pittenger, while plaintiff's primary care physician, treated plaintiff primarily for her physical ailments. Indeed, a review of the record shows that once plaintiff began to undergo regular psychological treatment with Dr. Crane and Counselor Lato, plaintiff directed her complaints regarding her mental condition to Dr. Crane and Ms. Lato rather than to Dr. Pittenger. As such, with respect to plaintiff's mental impairments, the ALJ determined to discount the only evidence in the record obtained from psychiatric specialists, including plaintiff's treating psychiatrist, in favor of evidence received from non-treating sources and/or one-time

consultants.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." <u>Singh</u>, 222 F.3d at 452. "By contrast, the opinion of a consulting physician who examines a claimant once . . . does not generally constitute substantial evidence." <u>Id.</u> Likewise, assessments from non-treating sources cannot constitute substantial evidence in the face of conflicting assessments from treating physicians. <u>Id.</u> Further, the Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to their area of speciality than to the opinion of a source who is not a specialist. <u>Id.</u> Notably, Dr. Crane and Dr. Rexroat are specialists in the field of psychiatry, while Drs. Bhattacharya, Jansen, Thomas, and Pittenger are not. Dr. Crane is plaintiff's treating psychiatrist and is the only treating specialist who can provide a longitudinal picture of plaintiff's mental health inasmuch as, at the time of the hearing, he had treated and monitored plaintiff's mental health condition continuously for a twelve-month period. <u>See</u> 20 C.F.R. § 416.927(d). In addition, Dr. Rexroat based his conclusions in part on the results of diagnostic testing and such findings were consistent with those of Dr. Crane. Finally, although Counselor Lato's opinions are not entitled to deference as opinions from a treating *medical* source, 20 C.F.R. § 416.913(a), they nevertheless are significant in demonstrating the severity of plaintiff's mental

- 38 -

impairment and how such impairment affects her ability to work, 20 C.F.R. § 416.913(d). Such significance is heightened in this cause given the extensive and continuing nature of Ms. Lato's counseling and observations of plaintiff, as well as the consistency of Ms. Lato's opinions with those of treating psychiatrist Dr. Crane, consulting psychiatrist Dr. Rexroat, and the results of the MMPI-II diagnostic testing. See Shontos v. Barnhart, 328 F.3d 418, 426-27 (8th Cir. 2003).

Finally, to the extent the ALJ determined to discount the opinions of these psychiatric specialists on account of inconsistencies between their treatment notes and their assessments as to plaintiff's ability to perform work-related activities, a review of the record as a whole does not support this determination. While throughout their treatment of plaintiff, Dr. Crane and Counselor Lato noted plaintiff to seem stable with her medication and appear to be "okay" as to her mental status, at no time did they render an opinion that plaintiff was capable of performing work-related activities. Treatment notes, in and of themselves, do not constitute opinion evidence as to a claimant's ability to engage in work-related activities. Cf. Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002) (where cursory treatment notes fail to detail a claimant's functional abilities, ALJ had obligation to contact treating physician to obtain assessment of how claimant's impairments affect ability to engage in work-related activities); Nevland v. Apfel, 204 F.3d 853, 858

(8th Cir. 2000) ("In spite of the numerous treatment notes . . .
not one of [claimant's] doctors was asked to comment on his ability
to function in the workplace."). Nor did Dr. Crane or Ms. Lato
advise or encourage plaintiff to engage in such activities. To the
contrary, Dr. Crane reported in January 2003 that plaintiff was
unable to work due, in part, to her mental condition; and in
September 2003, Ms. Lato reported that plaintiff suffered a "severe
degree of risk" in her ability to function at work. As such, to
the extent Dr. Crane and Ms. Lato rendered "opinions" during their
treatment of plaintiff as to plaintiff's ability to work, such
opinions are not inconsistent with the conclusions made in their
formal RFC assessments completed for Disability Determinations.
Further, as noted by the Eighth Circuit, there is no inconsistency
*per se* in a noted improvement of symptoms and an opinion that the
claimant remains too disabled to work. See Cox v. Barnhart, 345
F.3d 606, 609 (8th Cir. 2003) ("It is possible for a person's
health to improve, and for the person to remain too disabled to
work."). The ALJ's determination to discount these opinions due to
their alleged inconsistencies was thus error.

Accordingly, for all of the foregoing reasons, the ALJ's
determination that plaintiff possessed the RFC to perform work-
related activities is not supported by substantial evidence on the
record as a whole inasmuch as such determination was based upon a
flawed credibility determination and a flawed analysis in reviewing

the opinions of plaintiff's medical sources. In determining plaintiff able to perform other work in the national economy, the ALJ relied upon the testimony of the vocational expert which was given in response to a hypothetical question based upon the ALJ's flawed credibility determination and flawed RFC assessment. Such testimony cannot constitute substantial evidence to support a conclusion that plaintiff is not disabled. Holmstrom v. Massanari, 270 F.3d 715, 722 (8th Cir. 2001); Baumgarten, 75 F.3d at 370. This cause should therefore be remanded for the Commissioner to properly evaluate the medical and other evidence of record, including an appropriate analysis of plaintiff's credibility in the manner required by and for the reasons discussed in Polaski.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be reversed and that the cause be remanded to the Commissioner for further proceedings.

The parties are advised that they have eleven days in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

UNITED STATES MAGISTRATE JUDGE

Dated this _16th_ day of February, 2006.